I'm going to split the time with a co-counsel who is going to discuss everything but what I'm going to discuss, which is the expert testimony in relation to the convictions. Can we determine what was proven beyond a reasonable doubt when the jury's deliberation was based on the expert's interpretation of calls? The calls in isolation have very little meaning without the expert's testimony. As you recall from the record, the two experts called by the government became the hub of the case, becoming like summary witnesses. There's some mention in some of the case law that historically there used to be these masters who would come and testify for the government. And what they did was they did refer to the wiretap testimony both in the context of being experts and also in the context of being lay witnesses. But they also filled in the background for those wiretaps based on what they either knew about the investigation or what they knew from the review of various types of police intelligence. What they did, in essence, Your Honor, is they displaced the jury by connecting and combining all of the admitted evidence with forms of testimonial hearsay to present a coherent, discernible, and internally consistent picture of the Vera brothers' guilt. Now, in the government's brief, the government says that the first expert, Agent Lavis, was familiar with a discrete number of code words, and they identified what those words were. But in going back to the 105 transcripts which were admitted in evidence, there were actually only a fraction of those transcripts which actually referred back to those particular terms. So this represented a very discrete number of drug slang vocabulary. The rest of it he was tasked with interpreting were either new terms, new code terms, or basically what I would characterize as cryptic conversations for the jury. So he was exposed to these new terms he had no prior familiarity with prior to this investigation. Counsel, I'm a little familiar with that problem, having authored Hermann Act and been on the panel in Freeman. Both of those cases, well, certainly Hermann Act, came up in the context of a direct challenge to the point you just made in the Daubert hearing. In this case, you filed a motion in limine, and you, in footnote one of your motion, said you didn't have any objection at that point to Lavis testifying about code words. The focus of your memorandum, and I understand why, was the Crawford hearsay issue and gang testimony. Your footnote said you would reserve the opportunity to object if the code word issue became a problem. I don't see in the record any kind of objection. There was a standing objection. Eventually it appears on the Crawford issue. But when did you ever bring before the district court the issues that are quite plainly laid out in Hermann Act if the expert goes beyond the code words that were Crawford and the kind of nature of the testimony? So we're reviewing for plain error here. And I have to say, I'm troubled with a roadmap that was clearly laid out as to how you deal with at least the code word kind of wiretap interpretation by agents who were participating partially in the event. I mean, in my mind, it seems the case on all fours, and with Freeman, to back it up, as to why there weren't objections made. So some of these problems could have been addressed there. There is a lot of testimony we've had to go through to figure out where the line was crossed. Well, in terms of the objections and the record below, the two trial defense counsel who were involved in the trial filed those motions in Limit A. And at some point, the judge said, first of all, an objection by one is an objection by both. And also said that your Crawford error is preserved. Preserved. I'm not talking about Crawford error. Preserved Crawford in 703. So now we're left with the dual role Freeman problem, which I also think, and I'm looking for it right now, that the district court has a lot of evidence that the court promised an instruction, or that he would watch out for crossing in the dual role for introducing hearsay that was based on the investigation, as opposed to stuff that would ordinarily be relied upon by an expert witness, which he never did. But he did say, but I think what Judge Fischer's talking about is the sort of dauber argument that, you know, was he, you know, was it, no foundation. No foundation, not reliable. Well, I don't think that you can necessarily say, well, it's Crawford, but it's not Federal rule of evidence error. I think that the two are really intertwined. Well, I'm just saying, where were the objections at the time? We're on plain error review, as far as I can tell. Well, I don't see it as plain error review. I see it as harmless error review, because once the court says your Crawford error is preserved and you look at it. But this is, Hermanek isn't about Crawford error. Right. It's not. It's going beyond foundation of an expert. That's true. And Freeman also did not address the confrontation violation of the Sixth Amendment. Well, I'm not addressing my remarks to the – I'm addressing my remarks to Lavas. You mentioned the code words. You said he went beyond the code words. That's true. But where was the objection on that aspect of his testimony? Well, when – Because – let me – I want to make sure we're talking on the same thing. You're talking about proof of the conspiracy. Lavas was Crawford, and that's why his code word information was in part relevant to drug amounts, correct? That's – well, relevant to types of drugs. Types of drugs and types of drug amounts. Amounts were more in terms of numbers and cryptic expressions for quantity. Those weren't so much – well, I guess you would say abbreviated terms. So, yes, code words. But what I'm – what I was trying to say was that when Crawford – after Crawford was decided, there's a part of Rule 703 which is affected because there's this obvious tension between 703 and Crawford. Right. And it's basically the last full sentence of the rule. Counsel, I can't hear you. You must be getting away from the microphone. Talk into the microphone. Oh, I'm sorry. You're getting away from it. I can't hear you. I apologize. The last – the last sentence of the rule says that if the facts or data would be otherwise inadmissible, the proponent of the opinion may disclose them to the jury only if they're probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect. Now, under Crawford, you can't even do that anymore because what you're talking – What did you just read from? This is Rule 703 in the Federal Rules. Okay. And that one was preserved. Well, that – well, Crawford error is preserved. That dovetails into the rule itself because – The district court judge said 703 was preserved. I beg your pardon? The district court judge said 703 was preserved. Well, it appears from the – 703 is slash 703. The quote – the quote at that portion of the transcript is, counsel, your Crawford error is preserved. You don't have to stand up every time. There's an – there would be an objection to it. The problem is, is that there was also in the motion, there was discussion of the rules and the relationship of the rules to Crawford, and this was the Seattle Law Review article that Judge Nevin of the Washington State Court got into, which is that you can't look at one and not the other. You have to consider both in tandem to determine whether the testimony is proper, not only in terms of whether there's a proper foundation laid, but in terms of what's being said. So what we had here were a series of transcripts that were very short, that were in many instances very cryptic, where there had been no evidence at all concerning the roles of the persons who were talking to defendants as to what they were – what they represented. This all came from police sources of information, what we would call testimonial hearsay as to behind by Crawford that is not – should not – should no longer be admissible as part of an expert's testimony. So, for example, if it was Calderon who was talking to one of the defendants or if it was Duarte who was talking to one of the defendants, there was no record evidence as to who Calderon was or to who Duarte was or Philip Cherbartiroff, who any of these people were, other than the testimony experts who said, oh, that person is involved in the sale of cocaine base, that's what that person does. Or this person is interested in heroin. There's nothing in the record, there's nothing in the transcripts, there's nothing from the testimony of the informant, Reyes, because he didn't know any of these people, to substantiate or corroborate what the expert was doing in his summary testimony as to what the whole case was about. And that's the problem with the violation here is that Crawford says you can't do that. You can't bring a witness in and fill in the gaps. You've got a bunch of transcripts, they don't mean much on their face, but the expert is going to tell you because he's part of the investigation or he's read a report or he's talked to some co-operator or whatever. He's been on the beat for many years and he's talked to people on the street. He knows exactly who these people are and what they represent. I'm going to give her an opportunity. Thank you. Thank you. Good morning, Your Honors. Gretchen Fusilier on behalf of the appellant Salvador Vera. Initially I'm going to address the issue of the insufficiency of the evidence for the four-point enhancement at the time of sentencing based on the court's finding that Salvador Vera was or had a leadership position in the many-street lopers gang. Our position is that the testimony should be ruled inadmissible because it was based on both unreliable and uncorroborated testimony. We had the testimony of Reyes, who was a six- or seven-time actually convicted felon, who had received $25,000 at least from the task force for his assistance as an informant. And he admitted in his testimony that he was still a chronic abuser of heroin from 2004 to 2009, which covers some of the period that this case was being investigated. Also in 2007, might have been the beginning of 2008, Agent Leibus wrote an FBI report indicating that they would no longer use Reyes because he was unreliable. Now, of course, Leibus's testimony tries to cover it up, it seems, by saying, well, he was unreliable only because we couldn't find him. However, in reading Reyes's testimony and the other testimony, it seems, and the cross-examinations, it appears that Reyes actually had been in and out of prison multiple times, and one of those times was during that 2007 period. So it wasn't he might have been unavailable, but they probably knew where he was. He was probably in prison at that time. Also, to underline the unreliability of the finding, we have the testimony of Agent Franks, or Officer Franks. He had been with the Santa Ana Police Department for 18 years. He testified that he participated in the gang suppression detail as a detective. He had contacts and knew about the mini-street gang because of his presence in the Santa Ana jail, and part of his duties was to circulate on the streets, make contact with those gang members, and identify who their members were. During the previous investigation of 2007, which was initiated by residents of Bishop Manor's complaints to the police about drug activities, and during those previous investigations, the name of Salvador and Armando Vera never came up. The only time that Salvador and Armando's name came up is after Reyes was arrested in the early part of 2008, and the arresting officer asked him to assist them in being an informant. And obviously it seems reasonable that he agreed to do that, with the motivation of perhaps continuing to feed his heroin addiction and also to get money to do that, and perhaps also to get some leniency on his then-current case. So we have the unfamiliarity by the police of the Veras as members of the mini-street gang. We have the unreliable and uncorroborated testimony of Reyes, and we don't believe that the testimony and the evidence on record was sufficient in order to conclude that he possessed a leadership position. First of all, you're overtaking time. But your argument is, it's assuming that we don't do something in your client's favor on the Agent Lavis testimony? I'm sorry, I didn't quite understand that. So I'm not, you're, are you assuming that we're going to roll against, in your argument right now, that we would roll against you on the Lavis, on the admissibility of Lavis' testimony? No, I don't anticipate a ruling in this hearing today, if that's the question. Eventually. Eventually. In other words, if they're guilty, he doesn't get leadership enhancement, though. That's correct. And also, we feel that the enhancement on the use of a minor was unreliable as well, because when Frank's testified, or Lavis testified about the government exhibit, which was a telephone conversation between, well, it was actually between Salvador Vera and Ramon, who was referred to as Ojito, his nephew, the government's position was when Salvador said to Ramon, did you get it? Or when Ojito said, I have it, Lavis testified that it referred to crack cocaine. However, when he was questioned on that, he was specifically asked about the fact that since he was being assisted in the Spanish conversations by the language monitor interpreters, that much of his testimony, as Lavis himself had testified, was based on that. And the... What other issues do you want to address? Just to make that last point. Oh, it was money as opposed to crack. Just tell me what are the other issues you want to, you feel that you haven't addressed. Well, we think that the quantity of the drugs, but maybe that is more linked to co-counsel's argument. Right. And I think we would submit on that. Good morning, Your Honors. May it please the Court, Anthony Brown for the United States. Are you the lawyer who tried this case? I was not, Your Honor. Did you read the transcript of Lavis's testimony? Of course, Your Honor. Did you notice that the trial counsel couldn't ask a non-leading question to save her life? There were several leading questions in the case. I mean, it was almost as though the prosecutor was testifying. There were many occasions when there were what could have been called leading questions. As Your Honor knows, it's within the discretion of the Court whether or not to rule on an objection to a leading question. But there were no objections that it was leading. There were not. But there should have been. I'm not trying to. Well, you don't have to. If I were the judge, I would have made her ask open-ended questions and not have the compounding, the dual role problem. There were several times when there were objections to the leading nature of the questions. But to put this in perspective, it was a case with 105 calls. And it took quite a deal of time. And I'm not sure if Your Honors picked it up from the record, but there were actually two people sitting in front of the jury to read the Spanish language interpretations. And then there were long calls that were made in English. So I think it was an effort on the part of the prosecutors to try to speed the case along. But if I may, Your Honor, I want to address the question of the standard of review. The Crawford error was preserved below by a motion to eliminate. And the Court addressed that. As to the 701, 702 overlapping of lay and expert opinion, there is no objection in the record to that. And, in fact, the argument was made for the first time on appeal. So I do agree with the Court that the standard of review here should be plain error. Judge Wardlow, you had asked for the district court's reference to Rule 703. And I believe that's in Armando Vera's excerpts of record on page 556. And that, the Court recognized there, I think, that what the objection really, or what the Crawford issue was, was that there was a possibility that hearsay could come in through the expert testimony. Experts obviously can testify based on hearsay. That's what Rule 703 said. But if it would otherwise be inadmissible, then it's not allowed to be disclosed to the jury. That's what Rule 703 says. So I think the Court here was aware of the issue of Crawford. And that issue has been preserved. As for the overlapping of lay and expert testimony, that was not preserved, Your Honor. That being said, and even though we're reviewing under plain error, I think there were occasions in the record when there was overlap of lay and expert testimony. But there were certainly the prosecutors set the case up so that the jury would be aware of when Agent Lavis was talking about his opinion based upon his review of the calls and things that he knew about the investigation, and when he was testifying based on his experience and knowledge as an expert. And let me give you a couple of examples. Very early on, before he had testified about any phone calls at all, the prosecutors asked Agent Lavis about how he was able to assign names to the people who were speaking in the phone calls, and he testified that he recognized the voices from listening to the calls themselves, but also from having met some of the people who were in the calls, if not all of the people. He also reviewed all of the intercepted calls, which, as the Court knows, being part of the conspiracy does not constitute hearsay. He also talked about, frequently throughout his testimony, about surveillance that he had conducted during the course of the investigation. The government introduced colored pictures of Julio Aumado's truck. He was somebody who participated in a May 29, 2008, delivery of heroin and cocaine to one of the frequent customers of the Vare Brothers. That was Sarah Stewart. And there was, early on in his testimony, a moment when he referred to police reports, and that was in the context of talking about Little Clown, one of the co-conspirators whose last name was Mondragon. The Court did, the Court struck that part of the testimony after there was an objection and instructed the jury specifically to disregard Agent Lavis's testimony that was hearsay, but allowed him to identify the callers on the phone calls. So I think what this shows is that early on in the case and throughout the case, the prosecutor was making it clear to the jury that there would be occasions when Agent Lavis would be talking about things that are within the realm of proper lay opinion, his recognition of the speaker's voices, his surveillance. And when he did stray outside the bounds, the Court, on occasion when it was objected to, would sustain those objections. You know, like Judge Fischer, I've seen several cases where the prosecutor uses these dual expert witnesses. And I'm just wondering why the U.S. Attorney's Office doesn't get a separate witness so that this is really clear and we don't risk the Crawford problem. Well, as the Court knows in Freeman, there's no per se rule that it's required of the U.S. Attorney's Office. No, we know that. But every U.S. attorney I ever asked said, yes, it would be better practice to do so. You know, let me offer an explanation and an argument for why it would not be good practice in a case like this. I think that it may have been a better practice for the prosecutor to lead into things like let's shift gears now and talk about, based upon your knowledge and your training, what a word like chair means. Let's shift gears now and talk about, based upon your review of these calls, when the word chair came up. And I think that would be a better practice. And I think that was followed in many circumstances in this case. There were times when ---- I was confused. I was really confused in reading this testimony when he was talking as a recipient witness, when he was giving lay opinion, when he was giving expert opinion, and what was that expert opinion based upon. I read the whole transcript myself. And I got confused. And then I went and looked at the transcripts of the tape. And some of them, I didn't look at all of them, all 115, but they seemed to be ghibli goop. And that was not an FF evidence. As a person who is not familiar with a lot of these gang terms, I couldn't decipher those transcripts standing alone. So what do we do in this kind of situation? I mean, we can't even really tell what was a statement based on inadmissible hearsay that they were trying to bring in through this dual expert lay witness. I think the Court needs to divide the issues that you just mentioned. One is whether hearsay comes in or not, which is a separate issue. And one is whether the same agent can testify as a lay and an expert witness. Well, we know that they can. But there's supposed to be an instruction, which I thought that the judge said he was going to give, but he didn't give, apparently. Did he? I don't know that the Court actually offered to give the instruction. Let me read it, because I've been wanting to come back to that. So this is what the judge said. The Ninth Circuit has clearly recognized propriety of gang experts in the case law. A gang expert relying upon the statements of others would be real tight on requiring compliance with 703. But I am not going to let an expert walk in hearsay. That's at RT1-19-7. And then he went on to say, if an expert points to sources that an expert in that particular field could reasonably rely upon, he can testify to that. And I will advise the jury at the time that testimony is given how they're to treat the expert testimony and distinguish between reliance on an opinion, those facts not coming to evidence for the truth, as opposed to the expert stating the bases for his opinion. Consider what he has said in terms of assessing opinion, not for the truth of the statements. There was never a limiting instruction along those lines given. Not that I'm aware of, Your Honor. Okay. However, well, in fact, there was one limiting instruction in the case, Your Honor, and that was on ‑‑ I cannot cite to the reporter's transcript, but I can cite to the government's excerpt of records, which includes the reporter's transcript on pages 142 through 53. And this is that portion of Agent Leibus's testimony where he was talking ‑‑ he was basically trying to identify the callers. And at one point he referenced a drug deal that took place with Mr. Mondragon. And that, after an objection by defense counsel, elicited jury instruction from the court. He said you're not supposed to take testimony with the exception of the identifications into account for the truth of the matter asserted. So when defense counsel objected, the court did offer the instructions. However, there was not an instruction at the end of the case as part of the jury instructions, if I recall. Judge Wardlow, I do want to get back to the question that you had posed earlier about separating the lay and the expert witnesses. And I want to just, for the court's awareness, point out that there are several calls where they were fairly clear that the testimony was exclusively expert testimony. And what the prosecutors tried to do early on is ask Agent Leibus, let's talk about some frequently used terms for crack, heroin and other drugs. And without talking about hearsay, anybody that you heard these terms from, just on your experience and your training alone, what is rock? Is crack often referred to by its color as whitish or yellowish? Is it sometimes referred to as something like a thin one? And why? And Agent Leibus was able to talk about his knowledge of how crack is produced, how it comes in a rock-like form, it comes in various colors of white off white. And in addition, he testified pretty extensively about how sometimes it can be sliced very thin in its final stage. He also talked frequently about prices and what were the going street values of drugs at different times. And based on that expert knowledge, he was able to say, for example, in Exhibit No. 44, which was a call between Victor and Armando Vera on July 10th, where Victor calls and says he has rock, and then says the thin ones, I did them as thin as possible. He was able, based exclusively on his expert testimony, to say, I believe this conversation is about one ounce of crack based upon the fact that they're talking about rock and based upon the fact that Victor described them as being thin ones. Yeah, but here's another one. This is on May 30, 08, between Salvador and Manuel. Should I take it to you? Should I pass it to you to look at? I already have it here at the house. Do you want me to take it over there? I will send my nephew to go pick it up. His interpretation and a conservative estimate that this is an ounce of crack cocaine they're talking about. In fact, it was powder cocaine, which is materially different, and the government conceded by stipulation that he got it wrong. I'm not sure I would say conceded. I would say the party stipulated to it so it became a fact. Stipulated that these calls were actually about powder cocaine. I'm not sure the reason for the stipulation, which is why I don't want to say that the government conceded that there was a failure of evidence there, if that makes sense to the court. No. It doesn't. No, that's being a little cagey. And then here's another one that on September 30, 08, between Armando and Philippe, and the whole call was, are you around right now? Can I come by? And he says, Lavis says, Philippe was contacting Armando to obtain 40 grams of heroin. Where's the expertise in that? Well, the, if the court recalls, there were three series of phone calls between Philippe, I'm not sure how to pronounce his name, Philippe Chabotaroff, and Armando Vera. The first took place on July 12th, and that was Exhibits 53 and 55. In that call, Chabotaroff asked Armando Vera for two pieces and to cut me some sort of a deal like 550. And the, and Armando Vera agreed. He said, yeah, I'll do it. At that point in, this is a GER, the government's excerpt of records of 219, Agent Lavis testified that two pieces to him signified two ounces, and he based that on the term pieces itself, but also his knowledge that the street value of heroin at the time was consistent with the discussion, the deal that was being struck. Then three days later, on July 15th, and this is Exhibits 61 and 62, Mr. Chabotaroff then negotiated a price of 650 for two pieces. And again, Agent Lavis testified that he interpreted that to mean two ounces of heroin for $650. And the calls that Your Honor is talking about, I don't think it's explicit, but I think it's clear that he is relying on the two previous calls to testify that this was something that Chabotaroff frequently did. In addition to that, he also testified that Chabotaroff had been seen during the incident, because Your Honors may recall that Bishop Manor was described early on in his testimony as being a series of apartments that was structured around a cul-de-sac, that there were runners and frequently lookouts who would spot policemen when they tried to get in. Agent Lavis spoke about the fact that as a white guy, he couldn't get into there without raising suspicions. In fact, Sarah Stewart, one of the frequent customers of the Vera's, wouldn't go anywhere near the housing complex. So the fact that they saw Chabotaroff there, who also the testimony was that he lived in South County, Orange County, which is pretty far away from Santa Ana, was significant corroborating evidence of the fact that he frequently went there to buy drugs. Your Honors, if I can, I want to address the one issue that was raised by defense counsel for Mr. Salvador Vera. I was a little confused, so if I'm going down the wrong track, please correct me, but it wasn't clear to me. It sounded to me like defense counsel was making an argument that Armando Vera had raised in his brief. And that it was being joined. So if I get off on the wrong track, please let me know. But both the Vera brothers, I think that there was no abuse of discretion by the district court here in sentencing the Vera brothers. And to the extent that there's an argument being made that neither of the brothers should have had an enhancement for the role in the conspiracy, certainly there was no abuse of discretion there. As for Salvador Vera, there was testimony that he was the leader of the Mini-Street Lopers. That was a gang that controlled Bishop Manor. That as the leader of a gang that controlled that specific housing complex, he would have had knowledge of everybody who was running drugs there. And part of the reason he needed that knowledge was to be able to pay taxes to the higher-up gang that controlled the wider area in Orange County. There were numerous phone calls. I think that what the argument was was that that was unreliable and should have been stricken as hearsay. Well, the phone calls themselves show numerous contacts between Salvador Vera and other people who were engaged in drug trafficking. The testimony was not unreliable. It was based on expert testimony about the nature of the conversations, including most of the people. But you said Reyes was unreliable. Reyes was unreliable. Well, I'm not sure that the Court can question the reliability at this point of the witness Reyes, but to the extent that he did testify about issues having to do with his role in the gang, that was corroborated by the other agents who testified about the structure of gangs and how gangs run their drug trafficking operations and on Exhibit 77, which was a phone call in which Salvador talked about being taxed. And the Court may recall the argument on that in the motion to eliminate. The point of introducing that call was to show specifically that he had a structural position that gave him a leadership role that was relevant to the existence of the conspiracy. Well, you're even more over your time than the witness. Let me ask you a question. I mean, it is two cases which each could have been devoted, had 15 minutes devoted to them, consolidated. So I knew we'd go over it a little bit. But suppose we were to agree, even on plain air review, that Crawford and Daubert were violated by Lavis' testimony. What's the remedy here? Where they virtually conceded guilt, didn't argue guilt, argued weight and type of drugs to the jury. Would we just vacate the special verdict but leave the convictions? That's a good question, Your Honor. And I'm not sure the answer. I would want to look at Elen a little bit more closely to see what his language is. I see where you're going. I'm not sure what the answer is. And I'll be frank with the Court. My first inclination is to say that might not be possible given that Elen holds that the quantity is now an element. But I'm not sure whether that's a term of art or whether that is an expression that is meant to say actually it is an element. It's not actually an element of the crime of distribution of drugs as it's written in the statute. But since Apprendi uses that language and then we had Ayen say it, pick up that language, it's an interesting question. And I would be happy to read it further if the Court would like that. We'll let you know? Soon. Okay. And I'd like to ask the same question of Mr. Schlesinger. Because I noted in your brief – no, I'm not giving you any more time to argue. This case is way over. But I noted in your brief you asked that we vacate the special verdict as the remedy. Is that a procedure that we could follow? It appears to be what they did in that Second Circuit case, Mejia. They vacated and remanded to determine whether the government wanted to retry. I think that was the conclusion. And what happened there basically was, in the Second Circuit, they found that some of Alicia's testimony was within the confines of the federal rules, but a lot of it wasn't, which is similar to what our situation is here. Yes, some of it is. That's true. I would say most of it is. I would say that most of the testimony that goes directly to the special findings as to quantity was based on testimonial hearsay because there's not enough in those transcripts to say what the amounts were. This really looks like a Petiani operation. Add to that the mention by Detective Franks that Salvador had connections to gangs when Armando, the government concedes, was not a gang member, where Reyes didn't even know the other players in the calls. None of those people were gang members. That whole gang thing that was pinned on these two defendants during the trial is prejudicial in itself. Well, but so what remedy are you asking for, if we were to agree with you on the... I would respectfully ask that the Court look to what they did in Mejia, because they vacated the convictions and remanded for determination as to whether the government wanted to retry because of the nature of the expert testimony that was received, which was rife with testimonial hearsay. Same way we have here. Every time Lavis gets up there to interpret a call, he says, oh, yeah, Gloria, she's a cocaine base seller. We don't have any evidence of that in the case other than what the expert is saying. Or, oh, yeah, Phillip, he's a heroin guy. And they claimed him to be a co-conspirator in the case. He was a retail purchaser of these people. And then add to that the fact that when you look at the calls in a vacuum, you don't get very far. Most of the time, the parties are just discussing the availability or someone's desire to purchase, and yet this, the key expert, Lavis, is saying, oh, no, we put that on the chart. That's another ounce. Or, you know, this is cocaine-based. That's heroin. Whatever. These aren't even consummated deals. These aren't even transactions. These are people talking on the phone about, hey, do you know anybody who's got any? Well, I don't know. Maybe I'll call Gloria. I'll see if she knows somebody. You're going to add that to the chart and say, yeah, that's going to bring you up to 280 grams of cocaine base. That's going to get you 500 grams of cocaine powder. Or that's going to get you whatever the threshold quantity, 100 grams of heroin, to get you up into the heights, you know, the threshold levels that are necessary to nail these guys for what the three objects of the conspiracy are in the indictment, which are those same three things. You've got to vacate. Vacate what? The special verdicts or the convictions? The convictions. You have to vacate the convictions because they're based on testimonial hearsay that was received by Lavis and by Franks. These guys are just walking it in. They've got a bunch of calls in here that really have no meaning in and of themselves. You present those to the jury in a vacuum. They're going to look at them and they're going to say, we have no idea what they're talking about. We don't know what a piece is. We don't know what one is. We don't know what two is or one and a half or whatever. Lavis is saying, oh, no, you can trust me. I'm an expert. I was percipient. I wasn't percipient. I didn't even have my boots on the ground. I'd never been inside Bishop Manor until the day of the takedown of this case. So the only thing I'm percipient about is the fact that I sat in a wire room and I listened to some calls, and I'm going to tell you, based on everything I know about this case, and you can trust me because I'm with FBI, that, you know, this person is a cocaine-based trafficker. And then the prosecution says, oh, well, wait a minute. For that particular call, he was wrong and we apologize. We're going to say it was powder.  All right. Thank you, counsel. The Court will be in a brief recess. In this case, U.S. v. Salvador and Armando Vera will be submitted.
judges: Noonan, Wardlaw, Fisher